169 So. 295

FRANKLIN v. STATE ex rel. ALABAMA STATE MILK CONTROL BOARD.

6 Div. 923.

Supreme Court of Alabama.

June 11, 1936.

Rehearing Denied July 16, 1936.

Hugh A. Locke, of Birmingham, for appellant.

.D. S. Satterwhite, White E. Gibson, White E. Gibson, Jr., and Dan. M. Gibson, all of Birmingham, for appellee.

KNIGHT, Justice.

The appeal in this case is prosecuted by the appellant, respondent in the court below, from a decree of the circuit court of Jefferson county, overruling respondent's demurrers to the bill filed against him by the Alabama state milk control board, and from the decree overruling the respondent's motion to dissolve the temporary injunction.

The case involves the constitutionality of the act known as the "Milk Control Board," so termed and called in the act (Gen.Acts 1935, p. 204).

The bill charges that the appellant "sold from his store, on divers occasions, sweet milk retailed and delivered at the door steps of consumers within the boundaries of the Birmingham Milk Shed at a price of thirteen cents per quart, which is less than the minimum price fixed by the Alabama State Milk Control Board for the sale of such milk in the Birmingham Milk Shed." That respondent has stated to the complainant his intention to continue to sell milk at a price less than that fixed by the said board; and that said unlawful conduct on the part of respondent, if allowed to continue, will cause irreparable injury to the milk dealers, producers, and producer-distributors, who are complying with the lawful orders of the board in marketing and selling milk in the Birmingham milk shed.

The prayer of the bill was for the issuance of a temporary injunction or restraining order, enjoining or restraining the respondent from selling milk below the minimum prices fixed for the sale of such milk by the Alabama state milk control board; and upon final hearing for a permanent injunction.

The bill was filed on December 4, 1935, and on the same day, on the order of the circuit judge, Hon. J. F. Thompson, a temporary injunction, in accordance with the prayer of the bill, was issued and served upon the respondent.

The respondent appeared and moved to dissolve the injunction, and also demurred to the bill on numerous constitutional grounds. The court overruled the motion and also the demurrers, and from this decree he appeals.

The demurrers of the respondent take the point that the act creating the Alabama state milk control board offends sections 5, 6, 11, 13, 42, 43, 44, 45, 48, 103, and 139 of the State Constitution, and also amendments 5, 7, and 14 of the Constitution of the United States.

The act in question was approved by the Governor of Alabama on July 9, 1935 (Gen. Acts 1935, p. 204).

By this act the Legislature of Alabama, inter alia, created and established a milk control board, with certain defined powers and duties, among those powers and duties was the power to designate natural marketing areas, which shall constitute the respective milk sheds of the state, and to fix, by official order, minimum and maximum prices for milk in the different milk sheds.

In view of the fact that the Legislature passed the act as an emergency matter, we deem it profitable, for a proper understanding of the applicable rules of law applying to such legislation, that certain provisions of the act should be here quoted.

Section 1 of the act provides:

"That it is hereby declared that milk is a necessary article of food for human consumption; that the production and maintenance of an adequate supply of healthful milk of proper chemical and physical content, free from contamination, is vital to the public health and welfare, and that the production, transportation, processing, storage, distribution and sale of milk, in the State of Alabama, is an industry affecting the public health and interest; that unfair, unjust, destructive and demoralizing trade practices have been and are now being carried on in the production, marketing, sale, processing and the distribution of milk, which constitute a constant menace to the health and welfare of the inhabitants of this State and tends to undermine sanitary regulations and standards of content and purity, however effectual such sanitary regulations may be attempted to be enforced, that health regulations alone are insufficient to prevent disturbances in the milk industry which threatens to destroy and seriously impair the future supply of milk and to safeguard the consuming public from future inadequacy of a supply of this necessary commodity. That it is the policy of this State to promote, foster and encourage the intelligent production and orderly marketing of commodities necessary to its citizens, including milk, to eliminate speculation and waste and to make the distribution of necessary commodities between the producer and consumer as direct as can be efficiently and economically done and to stabilize the marketing of such commodities, including milk, through the organization and operation of Producers and Producer-Distributors Cooperative Associations. That the normal process of producing and marketing milk has come to be a cooperative industry of vast importance to the State and of vital interest to the consuming public, which ought to be safeguarded and protected in the public interest. That the present economic depression, through which we have been and are now passing, and the disparity of the prices received by producers and producer-distributors and the prices which such producers and producer-distributors are forced to pay for articles purchased, has broken down the orderly exchange of commodities produced and marketed by them for commodities purchased by them, has seriously impaired the assets of producers and producer-distributors and dairy assets supporting the credit structure of this State and has created an emergency which the Federal Congress has recognized and has attempted to meet by Legislation, granting the Secretary of Agriculture certain powers relative to the production, sale and distribution of agricultural products including milk. Actual experience has shown that the exercise of State authority, and State regulation in addition to Federal regulation, is necessary to protect the public welfare and health of this State and provide a constant and adequate supply of milk to the public. That the necessity of pure and wholesome milk as an article of food, that the unfair, unjust, destructive and demoralizing trade practices which have been and are now being carried on in the production, production and distribution, sale, processing and distribution of milk, the serious disturbances which have taken place in industry, the maladjustment of prices of farm commodities, with prices which farmers are compelled to pay, and the inability of Federal Regulations to function in this economic emergency, without the cooperation of the State Agencies, has created an emergency in this State which required immediate correction. The foregoing statement of facts, policy and application of this law are hereby declared a matter of legislative determination."

The legislative declaration set forth in the quoted section of the act discloses that the Legislature of Alabama, at that time, was of the opinion that there did in fact exist an emergency, and that the conditions then prevailing in the milk industry of the state threatened to destroy and seriously impair the future supply of milk to the people of the state.

■ In view of the ruling upon the demurrer by the trial court, and the legislative declaration of the existence of an emergency in the milk industry, which at least is prima facie true, we are justified in treating the case on this appeal upon the theory that there was in fact such emergency at the time of the passage of the act, since we judicially know nothing to the contrary. Chastleton Corporation v. Sinclair, 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841; People v. Title & Mortgage Guarantee Co., 264 N.Y. 69, 190 N.E. 153, 96 A.L.R. 297; Wilson Banking Co. Liquidating Corp. v. Colvard, 172 Miss. 804, 161 So. 123.

In determining the validity of the act now attacked upon constitutional grounds, the mudsill question to be determined is whether or not the enactment was a reasonable exercise of the police power of the state; or, in other words, whether the relief intended to be given is of a character appropriate to the existing emergency, and reasonably intended to protect against, or to alleviate, the calamitous conditions prevailing or threatened.

■ The limits of a state's police power has never been fixed, nor its boundaries defined. It is not subject to any definite limitations or boundaries, but it represents the state's great reserve power, and is at all times coextensive with the necessities of the case and the safeguard of the public interest. State v. Kartus, 230 Ala. 352, 162 So. 533, 101 A.L.R. 1336, 1337; Camfield v. United States, 167 U.S. 518, 524, 17 S.Ct. 864, 42 L.Ed. 260.

In the case of Samuel Thurlow v. Commonwealth of Massachusetts, 5 How. 504, 583, 12 L.Ed. 256, Chief Justice Taney, in speaking of the police power of a state, made the following observation:

"But what are the police powers of a State? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a State passes a quarantine law, or a law to punish offences, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same power; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates; and its authority to make regulations of commerce is as absolute as its power to pass health laws, except in so far as it has been restricted by the constitution of the United States."

■ The right of the citizen to the enjoyment of his property, and to exercise dominion over it is not absolute, but is subject to the right of the state, when the public interest requires it, to regulate the enjoyment, and the use of the property. Whenever a conflict occurs between private rights and the rights of the state to regulate "the use of the property and the conduct of business," subject only to constitutional limitations, private right must yield to the public need.

Many decisions could be cited to show that the private character of a business does not necessarily, of itself, remove it from the realm of regulation of charges and fines. German Alliance Ins. Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1915C, 1189; Griffith v. Connecticut, 218 U.S. 563, 31 S.Ct. 132, 54 L.Ed. 1151; Brass v. North Dakota, 153 U.S. 391, 14 S.Ct. 857, 38 L.Ed. 757.

■ The insistence by the appellant that the act in question, in the particulars pointed out by his demurrer offends the Fourteenth and Fifth Amendments to the Constitution of the United States has, in our opinion, been foreclosed, or concluded against him by the Supreme Court of the United States in the case of Nebbia v. New York, 291 U.S. 502, 506, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469.

In the Nebbia Case, supra, the Supreme Court of the United States was called upon to review the decision of the New York Court of Appeals (People v. Nebbia, 262 N.Y. 259, 186 N.E. 694), which had sustained the constitutionality of the milk law of the state of New York against the attack that it violated the Fourteenth Amendment to the Constitution of the United States.

It is conceded in brief of counsel for appellant in this case that the Alabama

Milk Law, involved in this case, is virtually a copy of the New York Milk Law.

Mr. Justice Roberts in delivering the opinion of the court in the Nebbia Case, supra, affirming the decision of the Court of Appeals of New York, upholding the New York Milk Law, observed:

"The lawmaking bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. [Public Service Comm. v. Great Northern Utilities Co., 289 U.S. 130, 53 S.Ct. 546, 77 L.Ed. 1080]. If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if *arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt,* and hence an unnecessary and unwarranted interference with individual liberty. [Italics supplied.]

"Tested by these considerations we find no basis in the due process clause of the Fourteenth Amendment for condemning the provisions of the Agriculture and Markets Law here drawn into question."

We are not impressed that the act in question violates any of the provisions of the Constitution of the United States, insisted upon in oral argument or briefs of counsel for appellant.

This brings us to a consideration of the several objections urged by appellant to the validity of the act, tested by the provisions of our State Constitution.

As we read and interpret the act, only a few questions of real moment are involved. We state them: (a) Was it within legislative competence, where a business or industry is affected with a public interest, to regulate that industry to the extent of fixing prices? (b) To that end, could the Legislature lawfully provide in the act for the appointment of an administrative board to carry out, and to make effective the provisions of the act, and confer upon that board: (1) The power to divide the state into milk sheds, and to make, promulgate, and enforce its rules and orders; and (2) to fix the prices of milk in the respective milk sheds designated by it? (c) Does the act in question confer upon the board the power to legislate in the matter of determining if, or when the act shall take effect? (d) Does the act attempt to confer upon the board the right to determine all issues of law or fact that may arise in the administration of the law, without the right to review by a court of competent jurisdiction?

We will endeavor to consider these questions, but we will not attempt to discuss them in the order stated.

■ There can be no serious doubt but that the business of producing and selling milk to the general public, as contemplated in the act, is a business that vitally affects the public. It is a business affected with a public interest, which is tantamount to saying "subject to the exercise of the police power," and to regulation and control, even to the extent of fixing prices. Nebbie v. New York, supra.

Justice Roberts, in speaking for the court in Nebbia v. New York, supra, observed: "Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights [Munn v. Illinois, 94 U.S. 113, 124, 125, 24 L.Ed. 77] nor contract rights [Allgeyer v. Louisiana, 165 U.S. 578, 591, 17 S.Ct. 427, 41 L.Ed. 832; Atlantic Coast Line R. Co. v. Riverside Mills, 219 U.S. 186, 202, 31 S.Ct. 164, 55 L.Ed. 167, 31 L.R.A.(N.S.) 7] are

absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest."

And Justice Barbour in speaking for the Supreme Court of the United States in New York v. Miln, 11 Pet. 102, 103, 9 L. Ed. 648, made this comprehensive and all inclusive pronouncement about the duty of the government to protect and foster the interest, safety, and welfare of its citizens: "It is not only the right, but the bounden and solemn duty of a state, to advance the safety, happiness, and prosperity of its people, and to provide for its general welfare, by any and every act of legislation which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise, are not surrendered or restrained by the constitution of the United States. All those powers which relate to merely municipal legislation, or which may more properly be called *internal police*, are not surrendered or restrained; and, consequently, in relation to these, the authority of a state is complete, unqualified, and exclusive."

Similar statutes to the one now under consideration have been adopted by the Legislatures of the states of New York (Laws 1933, c. 158), New Jersey (N.J. St. Annual 1933, § 81—162A(25) et seq.), Indiana (Acts 1935, c. 281), and Virginia (Acts 1934, c. 357). Each of these statutes have had the consideration of the highest courts in the respective states, and each of the statutes has been upheld as a valid exercise of the police power of the state. People of New York v. Nebbia, 262 N.Y. 259, 186 N.E. 694, 698; Albert v. Milk Control Board (Ind.Sup.) 200 N.E. 688; State Board of Milk Control v. Newark Milk Co., 118 N.J.Eq. 504, 179 A. 116; Reynolds v. Milk Commission, 163 Va. 957, 179 S.E. 507.

In the Nebbia Case, supra, it was observed by Chief Justice Pound, in speaking for the Court of Appeals of New York:

"We are accustomed to rate regulation in cases of public utilities and other analogous cases and to the extension of such regulative power into similar fields. Rents have been regulated to prevent the exactions of greedy landlords who would contend that their property was taken from them when they were deprived of the right to do what they would with their own. Block v. Hirsh, supra [256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L. R. 165]; Brown Holding Co. v. Feldman, 256 U.S. 170, 41 S.Ct. 465, 65 L.Ed. 877. Compensation has been provided for workmen injured by the necessary risks of their employment, although the common law cast the burden of such risks on the workman. Arizona Employers' Liability Cases, 250 U. S. 400, 39 S.Ct. 553, 63 L.Ed. 1058, 6 A.L. R. 1537. Preference to citizens in employment of laborers on public works has been upheld. Heim v. McCall, 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206, Ann.Cas. 1917B, 287. Prevailing rate of wages laws for workmen on municipal contracts have been upheld. Atkin v. Kansas, 191 U.S. 207, 24 S.Ct. 124, 48 L.Ed. 148; Austin v. City of New York, 258 N.Y. 113, 179 N.E. 313. Usury laws are of an ancient house. Tariffs for the protection of home industries are upheld. Sugar bounties have not been declared unconstitutional. United States v. Realty Co., 163 U.S. 427, 16 S. Ct. 1120, 41 L.Ed. 215. The rates of grain elevators (Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77) and cotton gins may be regulated (Frost v. Corporation Commission of Oklahoma, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483). Rate fixing in the business of insurance has been upheld. German Alliance Ins. Co. v. Sup't. of Ins. of Kansas, 233 U.S. 389, 34 S.Ct. 612, 58 L. Ed. 1011, L.R.A.1915C, 1189; O'Gorman & Young, Inc., v. Hartford Fire Ins. Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324 [72 A.L.R. 1163]. The regulation of wages of railroad employees has been sustained Wilson v. New, 243 U.S. 332, 37 S. Ct. 298, 61 L.Ed. 755, L.R.A.1917E, 938, Ann.Cas.1918A, 1024. The business of dealing in milk has been regulated so as to protect producers who must sell their produce on credit. People v. Perretta, supra [253 N.Y. 305, 171 N.E. 72, 84 A.L. R. 636]. Commission merchants have been required to give bonds for honest accounting to prevent evils incident to the business of dealing in farm products. Payne v. Kansas, 248 U.S. 112, 39 S.Ct. 32, 63 L.Ed. 153. * * *

"We are unable to say that the Legislature is lacking in power, not only to regulate and encourage the production of milk, but also, when conditions require, to regulate the prices to be paid for it, so that a fair return may be obtained by the pro-

ducer and a vital industry preserved from destruction. Hamilton, 'Affectation with Public Interest,' 39 Yale Law Journal, 1089–1101. The policy of noninterference with individual freedom must at times give way to the policy of compulsion for the general welfare."

In the case of Albert v. Milk Control Board, 200 N.E. 688, 693, the "Milk Control Law" of Indiana, practically in every respect similar to our own, Justice Hughes, writing for the Supreme Court of Indiana, after fully sustaining the power of the Legislature to fix prices of milk, observes, as to the contention of appellant, that the act attempts to delegate legislative authority to the board to fix the time it shall take effect, and was therefore void, being in violation of section 25, article 1, of the Constitution of Indiana:

"Appellants cannot be serious as to this contention. There was an emergency clause to the act [similar to the clause in the law now under consideration] which provided for the immediate taking effect of the act at the time of its passage. The act was in full force and effect at the time of its passage, and that part of section 7 as set out, was for the benefit of those desiring to come within the act to have sufficient time within which to obtain a license as provided. School City of Marion v. Forrest (1906) 168 Ind. 94, 78 N.E. 187; Isenhour v. State (1901) 157 Ind. 517, 62 N.E. 40, 87 Am.St.Rep. 228."

■ There is no merit in the contention of appellant that the act in question attempts to delegate legislative authority to the board to fix the time the act shall take effect. It was effective and in force from and after its approval by the Governor.

However, this court in the case of Ward v. State ex rel. Parker et al., 154 Ala. 227, 45 So. 655, 656, held: " 'The Legislature may pass a valid statute, to take effect upon the happening of a future event, and may delegate to an officer or person the power of determining and announcing whether such event has happened.' [Hand v. Stapleton, 135 Ala. 156, 33 So. 689.] To the same effect, applying the defined principle, are Childers v. Shepherd, 142 Ala. 385, 39 So. 235; Jackson v. State, 131 Ala. 21, 31 So. 380; Davis v. State, 141 Ala. 84, 37 So. 454, 109 Am.St.Rep. 19; Dunn v. County Court, 85 Ala. 144, 4 So. 661; Stanfill v. County Court, 80 Ala. 287; McGraw v. County Com'rs, 89 Ala. 407, 8

So. 852; Clarke v. Jack, 60 Ala. 271; and other authorities in these citations referred to. The case of Mitchell v. State ex rel. Florence Dispensary, 134 Ala. 392, 32 So. 687, is not applicable to the status presented by the provisions of section 199. The court takes the case of State v. Parker, 26 Vt. 357, to be directly in point, and in support of its conclusion. This authority is cited, and quoted from approvingly, in Hand v. Stapleton, supra."

■ It is also contended that the act violates section 44 of the Constitution of Alabama, in that it attempts to confer legislative authority upon the milk control board to fix prices, milk sheds, and rules and regulations. This contention is likewise without merit. Railroad Commission v. Alabama Northern Ry. Co., 182 Ala. 357, 62 So. 749; Whaley v. State, 168 Ala. 152, 52 So. 941, 30 L.R.A.(N.S.) 499; State v. McCarty, 5 Ala.App. 212, 59 So. 543; Ward v. State ex rel., 154 Ala. 227, 45 So. 655; Tallassee Falls Mfg. Co. v. Commissioner's Court, 158 Ala. 263, 48 So. 354; State ex rel. v. State Board of Medical Examiners, 209 Ala. 9, 95 So. 295; Parke v. Bradley, State Treasurer, 204 Ala. 455, 458, 86 So. 28; Albert et al. v. Milk Control Board, supra.

■ It is also contended that the act attempts to confer upon the milk control board judicial power in violation of section 139 of the Constitution.

We are not impressed by anything contained in the act that the Legislature in creating the milk control board transcended constitutional bounds. Any orders of the board, which any party in interest deemed illegal or wrongful, may be reviewed by a court of competent jurisdiction. This preserved *due* process to the aggrieved party.

In the case of State ex rel. State Board of Milk Control v. Newark Mill Co., 118 N.J.Eq. 504, 179 A. 116, 125, the Court of Errors and Appeals of New Jersey, in passing upon the Milk Control Act adopted by the Legislature of that state, after holding that it was within the competence of the Legislature to fix prices of milk, made the following observation with reference to the appointment of the board of control provided for in the act:

"The Legislature indubitably has power to vest a large measure of discretionary authority in the agency charged with the administration of a law, enacted in pur-

suance of the police power, to secure the health and safety of the people. This authority is one of common exercise; it invokes the principle that sustains rate-making laws, and the authority vested in examining and control boards, created to regulate the professions, trades, businesses, and other callings, deemed by the law-making body to be the proper subjects of governmental supervision. It is only necessary that the statute establish a sufficient basic standard—a definite and certain policy and rule of action for the guidance of the agency created to administer the law. The exercise of such authority is neither legislative nor judicial in a constitutional sense. Tested by these considerations, the act in question does not offend the constitutional inhibition invoked. Compare Interstate Commerce Commission v. Goodrich Transit Co., 224 U.S. 194, 32 S.Ct. 436, 56 L.Ed. 729; Red 'C' Oil Mfg. Co. v. Board·of Agriculture, 222 U.S. 380, 32 S.Ct. 152, 56 L.Ed. 240; Panama Refining Co. v. Ryan, 293 U.S. 539, 55 S.Ct. 83, 79 L.Ed. 645; Buttfield v. Stranahan, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525."

In the case of Reynolds et al. v. Milk Commission of Virginia, 163 Va. 957, 179 S.E. 507, the Supreme Court of Virginia, after holding that it was within legislative competence to fix prices of milk, held that the determination of the state Legislature as to the necessity, character, and degree of regulation of an industry should not be disturbed, unless clearly arbitrary and unjust. That the statute adopted by the Legislature of Virginia authorizing the milk commission to divide the state into milk sheds, and to fix maximum and minimum prices for milk within such designated areas, was constitutional. And the fact that the statute authorized the milk commission to adopt and enforce rules necessary to carry out the purposes of the act authorizing control of the milk industry did not render the statute· invalid on the ground that it delegated to the commission power to enact legislature both prohibitory and penal in character, operative only in such milk areas as the commission might define.

We are of the opinion the Legislature did not exceed its powers in creating the milk control board, nor in the powers conferred upon the board.

 It is also insisted that the act violates section 11 of the Constitution, in that it denies appellant trial by jury.

It only remains to be said that if, and when, the appellant is indicted for the violation of any of the provisions of the law, or of any of the rules of the milk control board, that question may then be presented. Suffice it to say that the act does not deny such right to the defendant.

 The board is now proceeding against the defendant in a court of equity, seeking injunctive relief, and in such cases the appellant is not entitled to a jury trial.

The case of Mitchell, Judge, v. State, 134 Ala. 392, 32 So. 687, is not analogous to the case now before the Court. The question there presented is quite different from the questions presented in the present case.

The case of State v. Goldstein, 207 Ala. 569, 93 So. 308, dealt with an act entirely different in its basic features from the Milk Control Board Act, now under consideration.

The act considered by this court in the Goldstein Case, supra, undertook to prevent and punish "profiteering" and to that end defined the offense of "profiteering" as "the selling or offering for sale of any article or commodity *of food, clothing, fuel* or other necessity of life with the intent of obtaining *fraudulent* or grossly excessive price over its true or intrinsic worth." Acts 1919, p. 1088, § 2.

The court pointed out in the Goldstein Case that the act was operative without regard to any conditions of scarcity or monopoly, or trade restrictions, whether the result of unlawful combinations or agreements, or otherwise, and although other dealers than the offender may be offering the article in plentiful supply at much lower prices.

A casual reading of the Goldstein Case, supra, will disclose that the learned justice did not have in mind any such measure as is now before the court.

As we read and construe the opinion in the Goldstein Case, it is not an authority in support of appellant's contention in this case. Nor do we purpose to disturb it. It was rendered upon an act wholly different from the act in question.

It only remains to be said that it is our opinion, and we so hold that so far as any constitutional objections urged by the appellant to the validity of the milk control board, and which he could, in his position,

urge, the statute is not violative of any provision of the State and Federal Constitution.

It is to be noted that the act was passed as emergency legislation, and expires by its own terms on June 30, 1939.

The decree of the circuit court overruling appellant's demurrer and motion to dissolve the temporary injunction is affirmed.

Affirmed.

ANDERSON, C. J., and GARDNER, THOMAS, BOULDIN, and FOSTER, JJ., concur.

BROWN, Justice (dissenting).

It is my judgment that said Milk Control Board Act (Act No. 163, Gen. Acts 1935, pp. 204–220) is subject to all the vices pointed out in State v. Goldstein, 207 Ala. 569, 93 So. 308, State v. Curran, 220 Ala. 4, 124 So. 909, and A. L. A. Schechter Poultry Corp. et al. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. It destroys the liberty of the citizen to contract with reference to his own property, to engage in the purchase and sale of the most common articles of food, although all the necessary health regulations are fully complied with. And section 13 of the act prohibits all persons not engaged in the milk business at the time the act goes into effect, from entering into such business.

The act, as appears on its face, was passed as an emergency law, when, in fact, it is designed to permanently dominate and control milk producing and selling. If the Legislature has the power to regulate private businesses, not hurtful to public morals or public health, why the necessity to declare an emergency? Emergencies do not suspend the Constitution or remove the citizen from its protection. To adopt the language approved by this court, speaking through Stone, J., " 'Believing, as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acquiring power—some evil to be avoided, or some good to be attained, by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined, and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. * * * If the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or the judiciary, in enlarging the powers of the government, opens the door for another, which will be sure to follow; and so the process goes on, until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them.' Sadler v. Langham, 34 Ala. 311, 335." In re Opinions of the Justices (In re Income Tax Enabling Act), 227 Ala. 291, 295, 149 So. 776, 780.

I do not agree with my brothers that said act does not violate the Constitution, both State and Federal.

If the Legislature may delegate to a bureau or board the power to fix the price and control the sale of milk, it can also exercise the same control, and in the same way, over butter, bacon, bread, eggs, potatoes, and other necessary articles of food.

Under the recent ruling of this court, whether or not such emergency exists, as is declared in the act, is a justiciable issue, and on proper pleading may be litigated in this case. Mutual Building & Loan Ass'n v. Moore, Adm'r, ante, p. 488, 169 So. 1.

I therefore respectfully dissent.