169 So. 1
## MUTUAL BUILDING & LOAN ASS'N v. MOORE.

**I Div. 907.**

Supreme Court of Alabama.
June 11, 1936.

Outlaw & Seale, of Mobile, for appellant.

Coleman, Spain, Stewart & Davies, J. W. Gillon, W. H. Woolverton, Cabaniss & Johnston, Lange, Simpson & Brantley, Bradley, Baldwin, All & White, Stokely, Scrivner, Dominick & Smith, E. H. Dryer, all of Birmingham, and Rushton, Crenshaw & Rushton, of Montgomery, filed briefs amici curiae challenging the act.

Wm. J. Young and Jos. C. Sullivan, Jr., both of Mobile, for appellee.

William S. Pritchard, of Birmingham, filed brief, amicus curia, supporting the act.

FOSTER, Justice.

Appellant was plaintiff and sued on certain described promissory notes made by another, and assumed by defendant in the purchase of some property and as set out in the deed.

The only question here raised relates to the sufficiency of a plea of set-off. It alleges that at the time the action was commenced (which was August 26, 1932), plaintiff held two mortgages upon certain described real estate, the possession of which has been delivered to plaintiff (at a time which was since the suit was begun), and seeks to have its fair market value set off against plaintiff's demand by virtue of section 3 of the Act of the Legislature approved June 24, 1935 (Gen.Acts 1935, pp. 184, 185).

A singular omission is the want of an averment that the mortgages were held as security for the debt sued on. But counsel on both sides so treat it, and therefore we will do so.

The plea, it is conceded, is dependent upon the effect of the Act of the Legislature referred to in it, and by express terms invokes the benefits of section 3 thereof.

The act has a preamble in which reference is made to the existence of a severe financial and economic depression, affecting the ability of property owners to meet payment of taxes and payments on mortgage debts, leading to foreclosures and sales at prices much below their real value, resulting in a pressing necessity for legislation in pursuance of the state's continuing and dominant protective policy. In section 9 (page 186), it is declared that the act is an emergency measure to safeguard the vital interests of the state and general welfare and to continue until October 1, 1939, or until the necessity therefor shall, by act of the Legislature, be sooner determined and declared not to exist. It was approved June 24, 1935, long after the institution of this suit.

Section 2 of the act, whose benefits are not sought by the plea, provides in substance (here only referring to mortgages, other matters not set up in the plea), that all actions at law then pending, or which may be thereafter instituted, on a debt secured by a mortgage on real estate, may be stayed by the court until the mortgage has been foreclosed, or if not sooner foreclosed, during the life of the act.

Section 3, whose benefits are here sought, provides that in all such actions, in addition to any other defense, defendant may plead set-off to the debt, in an amount equal to the fair market value of said real

estate, to be determined by the court or jury, as the case may be, with no right to judgment over.

This right is not made to be affected by the question of whether the mortgage has been foreclosed, or the acquisition of the property by the mortgagee, or financial ability of the debtor to pay as he agreed.

Section 4 (page 185) provides that to such a suit when the mortgage has been foreclosed, defendant may plead that at the sale the property did not bring its fair and reasonable value, and under such plea he may have credit for its fair and reasonable value; but, by section 5, he is not entitled to a judgment over. Section 6 (page 186) applies to foreclosures in equity.

If we construe the plea to mean, as counsel have argued, that the debt sued on was secured by the mortgages there mentioned, it seeks to invoke the benefit of section 3, alleging, though not necessary by the act, that possession of the property has been delivered by defendant to plaintiff. The only facts, therefore, on which the right to set off the fair market value of the real estate are that plaintiff holds two mortgages on it (presumably to secure the debt sued on), and that defendant has delivered the property to plaintiff.

The plea does not allege that the mortgage has been foreclosed, nor that by it or any other conveyance or proceeding a good title to the land was passed to the mortgagee, clear of prior incumbrances. It does not allege that by the mortgage it was agreed that payment could be made in any way or manner except in money.

None of such allegations are required by section 3 to make the plea available. So that under its provisions it is good matter of set-off to the amount of the fair market value of the real estate, though a·good title did not pass by the mortgage, and though the mortgagor still has the equity of redemption, and though the agreement was to pay the debt in money only, and the mortgagee has done nothing to justify a counterclaim ordinarily necessary to sustain a plea of set-off, nor otherwise violated any right of the mortgagor, all in respect to a claim which arose by contract made before the act came into being, and a suit on it then pending.

Section 10 of article 1 of the Constitution of the United States ordains that no state shall pass a "law impairing the Obligation of Contracts." Section 22 of the Alabama Constitution is that no "law impairing the obligations of contracts" shall be passed by the Legislature. Section 95 of. the Alabama Constitution is that "There can be no law of this state impairing the obligation of contracts by destroying or·impairing the remedy for their enforcement."

Since the beginning of the financial depression referred to in our act now under consideration many states have enacted moratory statutes which have been considered by the state and national courts of last resort. Since they must be measured by section 10 of article 1 of the National Constitution, as well as our own to the same effect, the decisions of the United States Supreme Court construing section 10, as applied to such statutes are controlling on us.

The first decision of that court during the period now under consideration was Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 232, 78 L.Ed. 413, 88 A.L.R. 1481. It dealt with a statute of Minnesota approved April 18, 1933 (Laws 1933, c. 339), and a synopsis of it, so far as here material, is thus stated by Chief Justice Hughes, who wrote the opinion: "We·are here concerned with the provisions of part 1, § 4, authorizing the district court of the county to extend the period of redemption from foreclosure sales 'for such additional time as the court may deem just and equitable,' subject to the above-described limitation. The extension is to be made upon application to the court, on notice, for an order determining the reasonable value of the income on the property involved in the sale, or, if it has no income, ·then the reasonable rental value of the property, and directing the mortgagor 'to pay all or a reasonable part of such income or rental value, in or toward the payment of taxes, insurance, interest, mortgage * * * indebtedness at such times·and in such manner' as shall be determined by the court."

It is there shown that the question he was dealing with was the provision allowing the court to extend the period of redemption from foreclosure sales. The mortgage had been foreclosed under power of sale, and under the law then applicable the period of redemption was one year, which was extended in the state court under authority of the act under consideration.

The Chief Justice writing emphasizes the fact that "the statute does not impair the integrity of the mortgage indebtedness"; nor "the validity of the sale or the right of a mortgagee-purchaser to title in fee, or his right to obtain a deficiency judgment, if the mortgagor fails to redeem within the prescribed period," and that "aside from the extension of time, the other conditions of redemption are unaltered"; and that during the extended period the mortgagee-purchaser has, so far as rental value is concerned, the equivalent of possession.

The question considered was whether the act to that extent impaired the obligations of contracts. It was said: "Emergency does not create power," but "may furnish the occasion for the exercise of power," and "may afford a reason for the exertion of a living power already enjoyed." The contract clause is also said to be "not an absolute one and is not to be read with literal exactness like a mathematical formula," so as not "to assign to contracts, universally, a literal purport, and to exact from them a rigid literal fulfilment." And that "nothing can be more material to the obligation than the means of enforcement. * * * The ideas of validity and remedy are inseparable, and both are parts of the obligation, which is guaranteed by the Constitution against invasion." But "without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct," provided "no substantial right secured by the contract is thereby impaired," with no attempt to fix definitely the line beyond which legislation may not extend, "and impairment, as above noted, has been predicated of laws which without destroying contracts derogate from substantial contractual rights." But not only existing laws must be read into contracts; "but the reservation of essential attributes of sovereign power" also. Both are deemed to be a part of the contract. And "the economic interests of the state may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts." And "the question is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end." But the reserved power of the state must be construed in harmony with the constitutional restrictions against impairing contracts.

But such restriction is said not to limit the reserved power to fix "limited and temporary interpositions with respect to the enforcement of contracts if made necessary by a great public calamity such as fire, flood, or earthquake." And also "when the urgent public need demanding such relief is produced by other and economic causes." Wherefore the court held that (1) an emergency existed; (2) the legislation was appropriate to a legitimate end; (3) that the relief (extension of redemption period) could only be granted on reasonable conditions; and (4) the conditions prescribed were reasonable.

That case was later referred to by the same Chief Justice in Worthen Co. v. Thomas, 292 U.S. 426, 54 S.Ct. 816, 79 L.Ed. 1344, 93 A.L.R. 173, but not in respect to a temporary emergency, economic measure, but holding section 10 to prohibit an act enlarging the right of exemption against existing debts.

In the case of Worthen Co. v. Kavanaugh, 295 U.S. 56, 55 S.Ct. 555, 79 L.Ed. 1298, 97 A.L.R. 905, the question related to an act of Arkansas giving property owners enlarged benefits in respect to the payment of improvement assessments, affecting mortgage holders. The opinion was by Justice Cardozo. While upholding the principles of the Blaisdell Case, supra, it was held that the rights of the mortgagee were not protected as in that case, but the privileges thereby extended violated the contract clause now under consideration.

And in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106, the court with Justice Brandeis writing was dealing with the Frazier-Lemke Act of June 28, 1934 (48 Stat. 1289), applicable only to existing debts of farmers secured by mortgage on farms and providing that if the mortgagee refuses to consent to certain prescribed conditions the mortgagor may obtain a stay of all proceedings for a period of five years, during which he shall retain possession of some or all the property, provided he pays a reasonable rental, and at the end of five years or within that period he may pay into court the appraised value thereof, and shall then hold the title and apply for a discharge in bankruptcy.

While the act was of Congress, which is not affected by section 10, the contract impairment clause, it was held that the bankruptcy power was subject to the Fifth

Amendment securing due process and protection of private property without just compensation. The question was argued by him on the assumption that the impairment of his contract rights for the public welfare without just compensation was prohibited, and treated the question in the light of Blaisdell and other such cases.

The question in them all is said to be whether the substantive rights of the mortgagee are substantially abridged, citing all the cases we have here mentioned. That act was applicable only to existing contracts, but the period of five years was fixed as the limit of the period; and while the question was not technically one of impairing the obligation of contracts, it was one of impairing property rights secured by a contract, which could not be done by Congress because of the Fifth Amendment, without just compensation. The holding was that it impaired the security of the mortgagee in respect to his property rights in the mortgage, and was invalid, although by it he obtained the full value of his security. It was said to take from the mortgagee the following property rights: 1. To retain a lien until the debt is paid (for that it allows the mortgagor to pay the mortgagee the appraised value of the land) when it becomes free from the lien. The Alabama law requires the mortgagee to take the land at the value fixed by the court. 2. To realize upon the security by a judicial public sale. 3. The right to determine when such sale shall be held. 4. The right to protect his interest by bidding at the sale. (With our act bidding at a public sale does not affect the question.) 5. The right to control the property during the period of default. (Our section 3 makes no such provision.)

But while the act only related to existing mortgages, it was not an exercise of a police power (which, the United States Congress does not have) to provide emergency measures effective only while it lasts. But the police power cannot suspend or depreciate the contract impairment clause.

Many state courts have considered the subject in respect to their various moratory acts and with various results. See notes 79 L.Ed. 311 et seq.; 97 A.L.R. 1124; 96 A.L.R. 826, 853; 94 A.L.R. 1352; 90 A.L.R. 1330; Adams v. Spillyards, 187 Ark. 641, 61 S.W.(2d) 686, 86 A.L.R. 1493, 1539; 88 A.L.R. 1519.

In Klinke v. Samuels, 264 N.Y. 144, 190 N.E. 324, 326, the Court of Appeals was dealing with such an act which contained a clause similar to our section 3. It was to be operative less than a year. It was said in the opinion: "There being no market for real estate of any kind, and the banks refusing to loan money on the best of real estate security, owners were caught, as it were, in a trap due to conditions over which no one had control and for which no relief was at hand. Value was in the property, but the value could not be obtained nor anything like it. To prevent worse and more extensive evils and suffering, the Legislature had asked, through these laws, for security holders to wait a reasonable time for universal economic conditions to improve, provided interest and taxes are paid." That act provided for a stay of suits for about a year, provided interest and taxes were paid.

Section 2 of the Alabama Act provides for a stay until the mortgage is foreclosed, or to October 1, 1939, with no provision for interest or taxes. Section 1083-b of the New York act (Civil Practice Act) differs from our section 3, so far as here material, by provision for deducting from the market value to be set off, the amount of prior liens, and it continued only for about a year to operate. It was sustained because it did not extend beyond the short emergency period named to July 1, 1934, being enacted and approved August 28, 1933, and because it was said to ask security holders to wait for that time during such conditions, provided interest and taxes are paid, and it did not affect them to their prejudice by such stay.

The Alabama act may have been patterned after that of New York. Neither of them give the creditor an option except to take no steps to prosecute a suit on his debt. If he decides to do so, by an action at law, the defendant has the right to choose one of two options. By the New York act he may stay the suit for a year or less upon payment of interest and taxes. By the Alabama law, he may stay it till the plaintiff sees fit to foreclose the mortgage or till October 1, 1939, without the payment of interest and taxes. Or he may let the suit go to trial and secure a reduction of the mortgage debt, though the mortgage has not been foreclosed, or property delivered to the mortgagee, by the amount of the market value of the property (in New York less the amount of prior liens), (in Alabama, without regard

to prior liens, unless it is interpolated by construction).

■ The New York Court of Appeals in the case cited above and in City Bank Farmers' Trust Co. v. Ardlea, Inc., 267 N.Y. 224, 196 N.E. 34, approved the principle that, without financial loss, a real estate mortgagee may, during a national emergency and for the benefit of the public, be forced to delay taking a personal judgment, or that if he does he must credit the amount of his debt with the market value of the realty on which he has a mortgage. He has the legal title and right to possession of the land. The limitations upon such enactments are that they cannot extend beyond the emergency, and that the creditor will sustain no financial loss. Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165.

It is authorized by the police power reserved by the state, and excepted from every contract. But as a police power it cannot materially and permanently impair the value of contract rights nor take property without just compensation, nor materially affect the financial status of the parties fixed by the contract, nor prohibit a prompt and convenient remedy for its enforcement. Edwards v. Williamson, 70 Ala. 145 (4).

It was said in Curry v. Reynolds, 44 Ala. 349: "The constitutional prohibition against impairing the obligation of contracts, and hindering and delaying justice, was aimed more at the robbery and denial of right by the supreme power, which had formerly been prevalent, than at any modified accommodation between the creditor and debtor, through changes of remedy in times of public misfortune, which might benefit society without the sacrifice of either."

■ Regardless of the time named in the statute for it to continue, the emergency is a condition to its operation. When that ceases, the act immediately becomes inoperative, though it provides otherwise. Chastleton Corporation v. Sinclair, 264 U.S. 543, 44 S.Ct. 405, 406, 68 L.Ed. 841; People v. Title & Mortgage Guarantee Co., 264 N.Y. 69, 190 N.E. 153, 96 A.L.R. 297; Wilson Banking Co. L. Corp. v. Colvard, 172 Miss. 804, 161 So. 123; Block v. Hirsh, supra.

The act of Alabama was approved June 24, 1935. The plea which invokes its benefits was filed August 7, 1935, and the demurrer to it was overruled December 9, 1935. There was no effort made to raise or press the judicial inquiry of whether on December 9, 1935, the emergency had passed, or whether it existed in fact on June 24, 1935, as declared by the Legislature, and it is not here urged in briefs.

In Chastleton Corporation v. Sinclair, supra, the United States Supreme Court, Justice Holmes writing, declared in substance that when an emergency is necessary to sustain a law, its existence when the law is enacted, and its continuance, are necessary to apply it to any suit. Its existence is also held to be a legal question, and "that the Court may ascertain as it sees fit any fact that is merely a ground for laying down a rule of law." In that case it was made to depend upon local conditions in Washington, where alone the law applied, and it was said that the trial court could more conveniently and accurately ascertain those facts, but should preserve the evidence so that the legal question may be reviewed. We have here a law of state-wide application.

■ At law issues of fact in pleading are made by a traverse or a confession and avoidance, such as by pleas, replications, etc., and issues of law are made by demurrer. When a demurrer alleges facts which do not otherwise appear in the pleading, it is a speaking demurrer and should not be considered on the basis of those facts. Webb v. J. R. Lowe & Co., 215 Ala. 552, 112 So. 138; 49 Corpus Juris 423, § 536. But it may be predicated upon what is judicially known without asserting the fact to exist, but treat it as existing.

We suppose what Justice Holmes meant to say for the court was that the continued existence of the emergency being necessary to determine the application of the law to the suit in hand, which was a legal question, must after all be controlled by such principles as apply to the consideration of all legal questions.

■ The existence of the emergency necessary to apply the law is dependent upon what the court judicially knows. The court knows many matters judicially which it does not know actually. When so, it may pursue such method as the judge wishes, to obtain the actual information; often taking evidence of it. Shafer v. Myers, 215 Ala. 678, 112 So. 230; Hodge v. Joy, 207 Ala. 198, 92 So. 171.

Indeed Justice Holmes in the Sinclair Case, supra, likewise so observed. See, also, Prentis v. Atlantic C. L. Co., 211 U.S. 210, 227, 29 S.Ct. 67, 53 L.Ed. 150, 159.

In this case, we might agree with what Justice Holmes there said that if the question were whether the statute is in force today upon facts which we know, we should be compelled to say that the act has ceased to operate. But we should not so declare we think so as to affect a suit in which the claim has not been made.

 So that if plaintiff wishes to make the point that there is no such emergency, he must demur to the plea assigning as a ground that the act is invalid because the emergency has passed or never existed. When the court acts upon that demurrer, the trial judge finds the status of the law as of the date when he rules, in such manner as he sees fit, and instructs the jury as upon any other legal question. When the case comes to this court on appeal, we review that ruling of the trial court, as we do in other respects, and apply our own judicial knowledge aided as we see fit.

 Since there was no demurrer to the plea on a ground which raised the question of the emergency, and no argument is made on the basis of an absence of it, we must review the ruling of the court on the demurrer upon the assumption that the emergency as declared by the act to exist, did then in fact exist, and continued until the ruling was made. If it then existed, the inquiry is whether the act deprived plaintiff of property or materially impaired his financial status made by his contract, or prohibited a suitable remedy. His title and right to possession and the use and occupation of the property are not disturbed nor postponed by section 3, nor the integrity of his debt or his right to collect it in full immediately.

He contracted to receive money, and his right to take money is for the time being changed to a duty to take property of equal value, or, at his election, not to prosecute his action until the emergency passes. So that the values which he is required to take are not materially lessened, nor their enjoyment postponed, but their nature is changed. This can only be done under the police power and during an emergency for the general welfare, in respect to existing contracts.

 The only difference, as we see it, between our section 3 and New York's section 1083-b, Civil Practice Act, assuming the emergency to continue, is that the latter expressly provides that the amount of the value for which defendant is entitled to a set-off is to be ascertained after deducting the amount owing on all prior liens and encumbrances, whereas the Alabama Act does not so expressly declare. But we think that is what the act means. It refers, we think, to the value of such interest as passed under the mortgage. If there were prior liens or encumbrances, then the mortgage conveyed a right which was subordinate to them. If the mortgagor's title was defective, a good one was not conveyed. But under the act, the mortgagor is entitled to a set-off, in the amount of the market value of such interest as was conveyed by the mortgage. True, the mortgagee may not be in possession, and his right to the land may be questioned. But if possession is denied him by the mortgagor on his demand, the mortgagor would be estopped to claim a set-off, or it should be denied on the ground that thereby there would be no present market value of the property rights conveyed by the mortgage, subject to set-off. The machinery of the law and applicable principles are sufficient to protect plaintiff against financial loss under section 3. We also note that if a mortgagor gets the benefit of a set-off under section 3 he is thereby estopped to deny plaintiff's right and title to the property whose market value was thus set off, and his right to its immediate possession.

 We hold then (1) that as to existing contracts, the act is only operative to apply either in a suit determined during such emergency, or to enforce a status then created under it; (2) that the market value mentioned in section 3 is of the property rights in the land effectually conveyed by the mortgage; and (3) that, as so interpreted, section 3, during the emergency, and in respect to existing contracts, with which we are dealing, does not violate section 10 of article 1 of the National Constitution, nor sections 22 or 95 of the Alabama Constitution.

The demurrer to the plea does not seek to present the question of the continued existence of the alleged emergency, and is not well taken without doing so.

We think, therefore, that there was no reversible error in overruling it.

Affirmed.

ANDERSON, C. J., and GARDNER, THOMAS, BOULDIN, BROWN, and KNIGHT, JJ., concur.